UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA,

                Plaintiff,                09 Cr. 339

   -against-                       OPINION

ANTONIO GUERRERO a/k/a "Tony," and
EDWIN MALDONADO,

                Defendants.

------------------------------------X

A P P E A R A N C E S:

### Attorney for the Government

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
By:  Laurie Korenbaum, Esq.
      Marissa Molé, Esq.
      Aimee Hector, Esq.

### Attorney for Defendant Antonio Guerrero

LAW OFFICE OF ROBERT J. KRAKOW, P.C.
1205 Franklin Avenue, Suite LL20
Garden City, New York 11530
By:  Robert J. Krakow, Esq.

### Attorney for Defendant Edwin Maldonado

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
By:  Don D. Buchwald, Esq.

**Sweet, D.J.**

Both Antonio Guerrero and Edwin Maldonado, along with Omar Flores, were convicted on all counts on June 7, 2010, after a six-week jury trial. In a motion filed on September 3, 2010, Defendant Edwin Maldonado ("Maldonado") moved, pursuant to Fed. R. Cr. P. 33, to set aside the jury's verdict and obtain a new trial. In a motion filed February 7, 2011, Defendant Antonio Guerrero ("Guerrero") moved, pursuant to Fed. R. Cr. P. 29 and 33, for a judgment of acquittal or, in the alternative, to set aside the jury's verdict and obtain a new trial. Based upon the conclusions set forth below, the motions of both Maldonado and Guerrero are denied.

This case arises out of the prosecution of members of the Solid Gold drug organization for the September 3, 1994 murders of Livino Ortega ("Ortega") and Fernando Garrido ("Garrido"); the October 9, 1994 murder of Leonard Overman ("Overman") and non-fatal shooting of Alvino Wade ("Wade"); and the December 13, 1994 murder of Carmen Diaz ("Diaz") and non-fatal shooting of Genero Rodriguez ("Rodriguez"). The shootings all took place in the Bronx, where Solid Gold sought to protect its retail crack cocaine business operating at 173rd Street and

Boston Road.  On October 14, 1994, following the first three
murders, Leonardo Flores ("Leonardo"),[1] also known as Robert
Mercado, was arrested and charged with the murders of Ortega,
Garrido and Overman.  Leonardo was subsequently convicted
following a 1996 trial in the Supreme Court of New York, Bronx
County (the "Bronx County trial"), but his conviction was
overturned after two eyewitnesses recanted, and new evidence was
discovered.  Leonardo subsequently pleaded guilty in state court
to the murders of Ortega and Garrido as an accessory.

## Prior Proceedings

On April 7, 2009, a Grand Jury in the Southern
District of New York returned and filed Indictment No. 09 Cr.
339 (the "Indictment") against Guerrero, Maldonado, Omar Flores
("Omar") and Johnny Cedeño ("Cedeño").  The Indictment alleged
eight criminal counts, charging these four defendants in
connection with three shootings that occurred in 1994 that
resulted in the murder of four victims.  Counts One and Two of
the Indictment charged Guerrero with the murder of Ortega and
Garrido on or about September 3, 1994, in violation of 21 U.S.C.

---

[1] Because this case involves three Flores brothers, the three
brothers are each referred to using their first names.

§ 848(e)(1)(A) and 18 U.S.C. § 2. Counts Three and Four charged Maldonado and Omar with the murder of Overman on or about October 9, 1994, in violation of 21 U.S.C. § 848(e)(1)(A), 18 U.S.C. § 924(j) and 18 U.S.C. § 2. Counts Five through Seven of the Indictment charged Maldonado, Omar and Cedeño with the non-fatal shooting of Rodriguez and the shooting death of Diaz on or about December 13, 1994, in violation of 18 U.S.C. § 1958, 21 U.S.C. § 848(e) and 18 U.S.C. § 2. Count Eight of the Indictment charged Maldonado with the same non-fatal shooting of Rodriguez and the shooting death of Diaz on or about December 13, 1994, in violation of 18 U.S.C. § 924(j) and 18 U.S.C. § 2.

On June 7, 2010, after a six-week jury trial, Maldonado was found guilty of Counts Three through Eight, Guerrero was found guilty of Counts One and Two and Omar was found guilty of Counts Five, Six and Seven. Charges remain pending against Cedeño, who was a fugitive and not tried with his co-defendants. Following the verdict, the Court granted a defense motion to extend the time to file post-trial motions to 90 days. On September 3, 2010, Maldonado filed a motion, pursuant to Fed. R. Cr. P. 33, to asset aside the jury's verdict and obtain a new trial. On February 7, 2011, Guerrero moved for a judgment of acquittal, pursuant to Fed. R. Cr. P. 29, or, in

the alternative, for a new trial, pursuant to Fed. R. Cr. P. 33.
Both motions were marked fully submitted on June 30, 2011.

## Trial Evidence

### A. The Solid Gold Crew

In the early to mid 1990s, Maldonado and Guerrero were
members of a crew that ran a retail crack cocaine spot on Boston
Road between 173rd and 174th Street in the Bronx. Ramon Flores
("Ramon") led the Solid Gold organization with a close group of
associates, including his brothers, Omar and Leonardo. The crew
called itself "Solid Gold," which was a reference to the gold
caps the crew used on their crack vials. The organization began
in 1992, when Ramon and Jimmy Feliz ("Feliz") staked out the
territory on Boston Road. Initial sales were slow. However,
following Feliz's arrest in 1993, the crew obtained the
assistance of Cedeño, who instructed the crew on a better way to
cook the crack using rum and ammonia. Business boomed, and
Solid Gold was making between $12,000 to $15,000 per day.

At its peak, the Boston Road spot sold approximately a
kilogram of crack cocaine a week. Solid Gold employed mangers

4

who ran the day to day drug business, stash house workers who bagged up the crack in individual packets and bundles so it could be sold to Sold Gold's customers, and "pitchers," who conducted the actual sales of crack cocaine at the drug spot. Guerrero worked steadily for approximately two years as a manager for Solid Gold. Maldonado worked for Solid Gold for a shorter period of time as a pitcher and sometimes manager.

During the course of its existence, Solid Gold maintained a number of stash houses which members used to store crack cocaine and numerous firearms. Guerrero's apartment, which was in a building directly across the street from the spot used to conduct the drug sales, was used to store firearms. Multiple witnesses testified that guns were kept in a bag at the bottom of one of Guerrero's closets. The guns included 9 millimeter semi-automatics, .357 revolvers and TEC-9s. Bullet proof vests and ammunition were also kept in Guerrero's apartment. The firearms were used by various members of Solid Gold, including Guerrero, Maldonado and the Flores brothers, to intimidate, threaten and murder Solid Gold's drug rivals. The evidence established several shootings, including Leonardo's 1993 shooting at drug selling competitors on Solid Gold's territory, the January 1994 murder of Feliz, two different

rooftop shootings, the double murder of Ortega and Garrido in September 1994, the murder of Overman and non-fatal shooting of Wade in October 1994, and the murder of Diaz and non-fatal shooting of Rodriguez in December 1994.

## B. The Murder of Jimmy Feliz on Boston Road and 173rd Street

On January 11, 1994, Jimmy Feliz ("Feliz") was shot in front of 1685 Boston Road in the Bronx. Feliz had recently been released from prison and had been attempting to regain control of the crack spot he had previously run with Ramon, which was now being run by Solid Gold. Ramon and other members of Solid Gold, including Leonardo and Guerrero, agreed that Feliz should be killed so that they could continue to control the spot. Ramon, Leonardo and another member of Solid Gold arranged for a gunman by the name of Fila to commit the murder. They agreed to pay the hired assassin and provided him with a .357 firearm to commit the murder. Feliz was shot multiple times near a bodega on 173rd Street and Boston Road. Members of the Solid Gold crew, including Guerrero, pretended to be outraged at this murder so that no one would know they were responsible. After the murder, Solid Gold operated the drug spot exclusively.

6

**C. The Murders of Ortega and Garrido on Minford Place**

On September 3, 1994, Ortega, a crack dealer, and his
friend, Garrido, were shot as they stood near a gas station on
Minford Place and 173rd Street in the Bronx, within 100 feet of
Solid Gold's drug spot. Both Ortega and Garrido died as a
result of their gunshot wounds.

The Solid Gold crew disfavored Ortega, who was selling
crack cocaine in close proximity to the Solid Gold spot and who
was directly competing with Solid Gold for customers.
Additionally, Ortega had sold crack of an inferior quality using
Solid Gold's packaging, thereby hurting Solid Gold's brand. As
a result, members of the Solid Gold crew had several
confrontations with Ortega.

Solid Gold also had a dispute with Overman, a/k/a
"Boo," who had operated the Solid Gold drug spot before Solid
Gold's predecessor, Feliz. Since being released from jail,
Overman had made it clear that he wanted the drug spot back for
himself and his partner, Wade. At one point, Ramon, Leonardo
and Guerrero armed themselves with guns from Guerrero's
apartment and prepared to shoot at Overman and Wade from the

7

rooftop of 1669 Boston Road. Guerrero, who was on duty as manager that day, left to attend to the spot shortly before the Flores brothers shot at Wade as he walked below in the street. The attempt to shoot Wade was unsuccessful as he managed to evade the gunfire and get away.

After Overman assaulted Ricky, one of the Solid Gold workers, members of Solid Gold, including Miguel Padilla ("Padilla"), Ramon, Leonardo and Guerrero sought out Overman to kill him. Using a white van, the crew planned to have Padilla drive and Guerrero shoot Overman from the vehicle. When the crew was unable to find Overman, however, they returned to Boston Road. Once there, the crew decided that, since they were armed and prepared, they might as well take the opportunity to kill Ortega.

In preparation for the anticipated shooting of Overman, Guerrero had armed himself earlier that day with a 9 millimeter firearm, which he had retrieved from his apartment on Boston Road. Guerrero, his face obscured by the hood of his sweatshirt, walked to the corner of 173rd Street and Minford Place and shot Ortega in the head at close range. Guerrero then shot Garrido, who had been standing with Ortega, in the back.

Guerrero then got into a white van that was waiting for him down the block. Padilla, who was in the driver's seat, drove a few blocks away, where Padilla and Guerrero regrouped with Ramon and Leonardo, who were waiting there in Leonardo's burgundy car. Guerrero got in the burgundy car and announced that "I killed him." Leonardo then drove away. Ortega, who sustained three gunshot wounds, died on the spot. Garrido, who sustained a single gunshot wound to the back, died some hours later at a hospital in the Bronx.

### D. The Murder of Overman and the Non-Fatal Shooting of Wade on Southern Boulevard

After the murders of Ortega and Garrido, the crew renewed its efforts to kill Overman and his partner, Wade. Given that Padilla was a key part of the Ortega/Garrido murder, Ramon called upon Padilla to kill Overman. Padilla informed Ramon that Maldonado was ready to assist. On the morning of October 9, 1994, Ramon, Padilla and Maldonado met at the apartment of Ramon's girlfriend Janita, which was a short distance from the spot on Southern Boulevard where Overman regularly sold marijuana. Maldonado was wearing a sweatshirt with a hood tied tightly around his face. Maldonado had been

9

given a .357 caliber revolver, and Ramon instructed Maldonado that Overman was to be shot in the head.

After Janita's mother, who was returning from her methadone treatment, confirmed that Overman was at his spot on the corner of Southern Boulevard and Crotona Park East, Maldonado, Padilla and Ramon left the apartment and Maldonado got on a bicycle and proceeded to Overman's drug spot. Maldonado later described to the crew members how he murdered Overman and shot Wade. Walking over to Overman and Wade as if he were going to purchase drugs, Maldonado pulled out the .357 revolver. Maldonado shot Wade in the leg, and then shot Overman, firing a fatal shot into Overman's head. Wade survived the shooting.

After the shooting Maldonado and Padilla rode their bicycles away from the scene and, later that day, reported to Ramon what had happened. Ramon and Guerrero ultimately met up with Leonardo and told Leonardo how the murder had occurred. Leonardo was displeased to find out that he had not been involved in the planning and because he arrived in the Bronx later that day with his wife and daughter without being aware of

the danger of retaliation. Ramon paid Maldonado $3,400 for the murder plus a TEC-9.

## E. The Murder of Diaz and the Non-Fatal Shooting of Rodriguez on Bathgate Avenue

In September 1994, Cedeño, an associate of members of Solid Gold, pled guilty to criminal possession of a weapon in the second degree and was sentenced to three to six years of incarceration. At the time of his arrest, Cedeño ran a retail crack cocaine spot in the vicinity of Bathgate Avenue and 178th Street in the Bronx and was involved in an ongoing turf war with Rodriguez, a/k/a "Jay." Rodriguez sold heroin on the same block as Cedeño. At the time, Rodriguez lived at 1993 Bathgate Avenue with his girlfriend and her daughter, Diaz.

Cedeño had a close relationship with members of Solid Gold and had taught Ramon how to cook crack cocaine. Moreover, prior to Cedeño's arrest, members of Solid Gold provided Cedeño with the crack he sold on Bathgate Avenue. After Cedeño's arrest, Solid Gold essentially ran Cedeño's crack business at Bathgate Avenue for Cedeño. While Cedeño was serving his sentence, he and members of Solid Gold arranged for Rodriguez to

11

be killed and for Solid Gold to continue selling crack at Cedeño's spot. Members of Solid Gold, Ramon, Omar and Padilla, traveled to the Orleans Correctional Facility in upstate New York where they met with Cedeño to discuss and plan the murder of Rodriguez and the arrangements to pay Maldonado to commit the crime. The Flores brothers and Padilla also spoke to Cedeño by phone in the days leading up to the Bathgate shootings, using the telephone of one of Cedeño's drug associates. During these meetings and conversations, Cedeño requested that Maldonado be recruited to commit the murder. Cedeño was impressed with how Maldonado handled the Overman murder, and he wanted to make sure that the attack on Rodriguez was successful. During these discussions, it was agreed that Ramon would pay Maldonado $7,000 out of money that Cedeño had lent to Ramon.

On December 13, 1994, Maldonado proceeded on a bicycle towards Bathgate Avenue. He approached Rodriguez, who was standing in front of 1993 Bathgate Avenue. Diaz was in the lobby of the building. Using a gun provided to him by Solid Gold, Maldonado shot both Rodriguez and Diaz numerous times. On January 1, 1995, about two weeks after she was shot, Diaz died of the gunshot wounds she had sustained. Rodriguez survived the shooting.

12

**F. The October 12, 1994 Arrest of Leonardo for the Murders of Ortega, Garrido and Overman**

On October 12, 1994, days after the Overman murder and two months prior to the Diaz murder, Leonardo, a/k/a "Roberto Mercado," was arrested and ultimately charged with the murders of Ortega, Garrido and Overman. In 1996, following a trial in the Supreme Court of New York, Bronx County, Leonardo was convicted based almost exclusively on the testimony of three eyewitnesses to the murders, all of whom testified that they saw Leonardo shoot the victims at point blank range. Ultimately, the two living eyewitnesses recanted their testimony to federal agents who were re-investigating the murders.

One of the living eyewitnesses, Omar Camacho, who was sixteen years old at the time Ortega and Garrido were murdered, had initially claimed and testified that he saw the shooting, saw the shooter's face and knew who the shooter was. Camacho later admitted that he never saw a shooter at all and had made up the version of events he later told to the police at the urging of his stepfather. The other living eyewitnesses, Wade, later admitted that although he was in close proximity to the

shooter, he could not, in any event, make an identification
because the shooter's face was almost entirely obscured by the
hood of his sweatshirt. Wade further admitted that, although he
never saw the shooter's face, he had no problem implicating
Leonardo because he knew that the shooter was a member of Solid
Gold and he did not particularly care which crew member went to
prison for the murder.

The third eyewitness, Ruben Negron, who died after the
trial, claimed that he was able to identify the person who shot
Ortega and Garrido from his parking lot, approximately 180 feet
away from the shooting, despite the fact that the shooter had a
hood on his head. Negron's version of events changed, and he
failed to inform the police in his initial statement that he
knew the shooter, a claim he only made after viewing an array
containing a photograph of Leonardo, who was known to him in the
neighborhood. Negron also failed to tell the authorities, until
days before Leonardo's trial commenced a year and a half later,
that the shooter had on one occasion threatened Negron with a
gun and claimed that he killed people for a living.

Camacho, Negron and Wade all testified against
Leonardo at his trial in 1996. There was no physical evidence

14

connecting Leonardo to the murders.  Leonardo was convicted of three counts of murder, plus the non-fatal shooting of Wade.  He was sentenced to 25 years to life on each murder count, the sentences to run consecutively.

As a result of evidence developed during the federal investigation into the murders of Ortega, Garrido and other homicides committed by the Solid Gold crew, including the recantations of Wade and Camacho, Leonardo made a motion to set aside the New York State convictions based on newly-discovered evidence.  The motion was granted.  Leonardo's prior convictions were vacated, and he pleaded guilty in state court to the September 3, 1994 murders of Ortega and Garrido as an accessory. He was sentenced to 15 years to life in state prison.

**The Applicable Standard**

Fed. R. Cr. P. 29(c) provides that a court may set aside a jury verdict and enter a judgment of acquittal when "the evidence is insufficient to sustain a conviction."  A defendant challenging the sufficiency of the evidence supporting his conviction "'bears a heavy burden.'"  United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (quoting United States v.

15

<u>Finley</u>, 245 F.3d 199, 202 (2d Cir. 2001)). In reviewing the sufficiency of the evidence, the court "view[s] the evidence presented in the light most favorable to the government and draw[s] all reasonable inferences in the government's favor." <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000). In addition, evidence must be considered "in its totality, not in isolation," <u>id.</u>, and the court will "'defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence.'" <u>United States v. Dhinsa</u>, 243 F.3d 635, 648 (2d Cir. 2001) (quoting <u>United States v. Morrison</u>, 153 F.3d 34, 49 (2d Cir. 1998)). The jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Dhinsa</u>, 243 F.3d at 649 (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); see also <u>United States v. Cassese</u>, 428 F.3d 92, 98 (2d Cir. 2005).

Fed. R. Cr. P. 33 states that a court may grant a defendant's request for a new trial "if the interest of justice so requires." A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33

16

authority 'sparingly' and only in 'the most extraordinary
circumstances.'" United States v. Ferguson, 246 F.3d 129, 134
(2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409,
1414 (2d Cir. 1992)); United States v. Triumph Capital Grp.,
Inc., 544 F.3d 149, 159 (2d Cir. 2008). Because the courts
generally must defer to the jury's resolution of conflicting
evidence and assessment of witness credibility, "[i]t is only
where exceptional circumstances can be demonstrated that the
trial judge may intrude upon the jury function of credibility
assessment." Sanchez, 969 F.3d at 1414. "The ultimate test on
a Rule 33 motion is whether letting a guilty verdict stand would
be manifest injustice . . . . There must be a real concern that
an innocent person may have been convicted." Ferguson, 246 F.3d
at 134. The trial court must be satisfied that "competent,
satisfactory and sufficient evidence" in the record supports the
jury verdict. Sanchez, 969 F.2d at 1414.


**Defendant Maldonado's Motion to Set Aside the Jury's Verdict and
Obtain a New Trial Is Denied**


In his September 3, 2010 motion to set aside the
jury's verdict and obtain a new trial, Maldonado raises four
main arguments: (1) Government Witness Jose Martes ("Martes")

17

improperly referred to Maldonado's prior murder arrest during his testimony at trial; (2) the Government improperly vouched for its witnesses during rebuttal; (3) the Government improperly attacked the credibility of Maldonado's counsel during rebuttal; and (4) the Court should have permitted Maldonado to re-call Ramon to the stand after Leonardo's testimony.

## A. Government Witness Martes' Reference to Maldonado's Previous Murder Arrest

Prior to trial, the Government sought permission to introduce evidence that Maldonado had obtained from Solid Gold the gun he used in a 1995 unrelated homicide. The Government's request to present this evidence was denied, the conclusion having been reached that any reference to the 1995 homicide would be highly prejudicial and, therefore, inadmissible. However, while on redirect examination, Martes was asked when he had last spoken to Maldonado, and, in response, Martes stated: "Well, before that it was for an arrest that he had in the state for a murder." Tr. 2132. Martes was referring to a murder for which Maldonado had been arrested by state authorities after the Overman and Diaz murders occurred. An objection to the question and answer was immediately made and sustained, and the answer

18

was stricken. This was the only reference made at trial to that arrest, and the issue was not raised in closing arguments.

In addressing the issue of Martes' testimony later that day, defense counsel stated that he "would like to give some thought to perhaps a way to undo it. I know your Honor has struck it but perhaps there is something beyond that." Tr. 2162. The Government agreed that a curative instruction would be warranted, if such an instruction were requested by defense counsel. Tr. 2163. The Government also provided its observation to the Court that the jury had no visible reaction to Martes' statement. Id. Maldonado's counsel did not dispute the Government's observation, and the subject of a mistrial or a curative instruction was never again raised.

Maldonado argues that Martes' response, which was made after Martes' credibility had been challenged on cross-examination, immeasurably prejudiced Maldonado and deprived him of a fair trial. According to the defendant, Martes' credibility had been called into question in at least three ways. First, Martes' rendition of the events on October 9, 1994 when Overman was shot differed significantly from the testimony Ramon offered. Second, Martes' assertion on cross-examination

19

that he saw Overman's body on the sidewalk at the corner of
Crotona Park East and Southern Boulevard exposed his claim of
being present to be false, given the position of Overman's body
on the yellow line in the middle of the street. Third,
Maldonado argues that the Government's theory that the
cooperators had no opportunity to coordinate their stories is
belied by the fact that Martes was tipped off by Sanchez' wife
months before his own arrest.

The right to a fair trial is a fundamental liberty
secured by the Fourteenth Amendment, and courts must be alert to
factors that may undermine the fairness of the fact-finding
process. Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691,
48 L.Ed.2d 126 (1976). While in Estelle, the Court held that
the practice of having a defendant appear before the jury
dressed in prison clothes deprived the defendant of the
presumption of innocence, the rule of Estelle does not apply "to
every 'mere utterance of the words [jail, prison or arrest],'
without reference to context or circumstances." United States
v. Atencio, 435 F.3d 1222, 1237 (10th Cir. 2006) (bracketed text
in the original) (quoting United States v. Villabona-Farnica, 63
F.3d 1051, 1058 (11th Cir. 1995); see also United States v.
Faulk, 53 Fed. Appx. 644, 648 (3d Cir. 2002). The test is

whether a particular practice "'was so inherently prejudicial as
to pose an unacceptable threat to defendant's right to a fair
trial . . .,' or whether the defendant shows actual prejudice
resulting from the practice." United States v. Walsh, No. 86-
3093, 1986 WL 18521, at *3 (6th Cir. Dec. 4, 1986) (quoting
Holbrook v. Flynn, 475 U.S. 560, 572, 106 S.Ct. 1340, 89 L.Ed.2d
525 (1986)).


"[A] brief and fleeting comment on the defendant's
incarceration during trial, without more, does not impair the
presumption of innocence to such an extent that a mistrial is
required." United States v. Deandrade, 600 F.3d 115, 119 (2d
Cir. 2010). In Deandrade, two prosecution witnesses made
reference to the fact that Deandrade was incarcerated at the
time of his trial, but the Second Circuit held that the district
court had not abused its discretion in denying a mistrial
because the two references were (1) isolated, and apparently
unintentional on the part of the prosecution; (2) incidental to
legitimate areas of inquiry; and (3) never referenced by the
Government again during the trial. Id. at 119 (citing United
States v. Castano, 999 F.2d 615, 618 (2d Cir. 1993) (concluding
that it was "extremely unlikely" that improperly admitted
evidence contributed to the guilty verdict because "[t]he

introduction of the evidence was inadvertent [and] . . . the prosecution did nothing to emphasize the statements at the time they were made, and never referred to them thereafter").

Maldonado's case is similar to Deandrade, in that the reference to Maldonado's arrest was "brief and fleeting," "isolated" and "apparently unintentional on the part of the prosecution," "incidental to legitimate areas of inquiry" and "never referenced [] thereafter." Deandrade, 660 F.3d at 119. Additionally, the prejudicial nature of Martes' statement is limited by the fact that Martes only referred to Maldanado's arrest and not that Maldonado had been found guilty and incarcerated for the 1995 murder. There is no proof that the Government intentionally adduced Martes' nonresponsive testimony, and immediately after the Court struck Martes' testimony, the prosecutor rephrased the question and moved on to another line of questioning. Martes' single reference to Maldonado's arrest is, under the applicable Rule 33 standard, insufficient to establish the "extraordinary circumstances" under which letting Maldonado's guilty verdict stand without a new trial represents a "manifest injustice." See Sanchez, 969 F.3d at 1414; Ferguson, 246 F.3d at 134.

## B. The Government's Assertions During Rebuttal That Witnesses Had Been "Vetted"

During her rebuttal summation, Assistant U.S. Attorney Laurie Korenbaum ("AUSA Korenbaum") stated:

> As Ms. Molé pointed out to you yesterday and it bears repeating, ladies and gentlemen, the fact is that insiders in criminal organizations such as Solid Gold are the ones who have the information about how those organizations work. They are the ones who know who have committed the crimes. We would love to put on only upstanding hardworking citizens. We would love to present those witnesses to you, ladies and gentlemen. But the fact is that Ms. Molé told you those aren't the witnesses to these kinds of violent crimes. So government uses insiders, cooperating witnesses. But we don't simply take them at their word, ladies and gentlemen. You heard Special Agent Mulham testify in detail about the vetting process for those cooperators. They are interviewed and proffered again and again and again. Their information is vetted. Their information is corroborated. We don't, Special Agent Mulham didn't just take Ramon Flores at his word or any of the other cooperating witnesses for that matter. The point is that the defense thinks if they dirty up the cooperators, you'll stop paying attention to what they told you from that stand and instead only pay attention to how bad they are.

Tr. 3299-3300. Immediately following these remarks, Maldonado's counsel objected and moved for a mistrial. Tr. 3356. The mistrial motion was denied, but the Court indicated that a corrective instruction would be considered. Tr. 3359.

Maldonado argues that the assertions made in the Government's rebuttal summation constitute improper vouching. See United States v. Modica, 663 F.2d 1173, 1178-79 (2d Cir. 1981). In Modica, the Government attempted in its summation to rehabilitate a prosecution witness' poor performance on the witness stand, stating "I suggest to you that [the witness] in part was a very truthful witness" and "I'm here to tell you that [witness'] testimony when it relates to the evidence in this case was truthful." Id. at 178. The Second Circuit held that it was improper for the prosecutor to vouch for the witness, noting that jurors understand that prosecutors have full access to the entire investigative file and that they may therefore surmise that the prosecutor's endorsement is based on something the prosecutor knows but has not introduced into evidence. Id. at 1178-79. Maldonado argues that the Government's rebuttal summation implied the existence of extraneous proof in the very manner Modica condemned.

In asserting that a prosecutor's remarks warrant a new trial, defendants "face a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of their right to a fair trial." United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993) (citing Blissett v.

Lefevre, 924 F.2d 434, 440 (2d Cir.), cert. denied, 502 U.S.
852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991)). "The government
has broad latitude in the inferences it may reasonably suggest
to the jury during summation." United States v. Zackson, 12
F.3d 1178, 1183 (2d Cir. 1993) (quoting United States v.
Casamento, 887 F.2d 1141, 1189 (2d Cir. 1989). Prosecutors are
granted greater leeway in rebuttal summations, which are often
improvised. United States v. Arias-Javier, 392 Fed. Appx. 896,
898 (2d Cir. 2010). In evaluating a claim of improper argument,
a court "must consider the objectionable remarks within the
context of the entire trial," United States v. Espinal, 981 F.2d
664, 666 (2d Cir. 1992) (citing United States v. Young, 470 U.S.
1, 11-12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)), granting relief
only if the remarks, "viewed against 'the entire argument before
the jury,' deprived the defendant of a fair trial." United
States v. Pena, 793 F.2d 486, 490 (2d Cir. 1986).

Even if the prosecutor's statements are deemed
improper, the misconduct is grounds for reversal "only if it
causes the defendant substantial prejudice so infecting the
trial with unfairness as to make the resulting conviction a
denial of due process." United States v. Shareef, 190 F.3d 71,
78 (2d Cir. 1999) (internal citations omitted); see also

<u>Zackson</u>, 12 F.3d at 1183 ("[A] prosecutor's statements during summation, if improper, will result in a denial of the defendant's due process rights if the statements cause substantial prejudice to the defendant.").

Analyzing the Government's rebuttal summation in the context of the whole trial reveals the prosecutor's remarks regarding the "vetting" of Government witnesses to be insufficient to warrant the grant of a new trial. A central theme of Maldonado's case attacked the credibility of the Government's witnesses, implying that the cooperating witnesses could not be trusted on account of their having committed various crimes. See, e.g. Tr. 3183 ("I told you in my opening statement, ladies and gentlemen . . . that you would be left in the last analysis with the testimony of a group of unsavory people and you would have to decide whether those people were telling the truth . . ."). Concerning the testimony of Ramon, defense counsel for Omar, Guerrero and Maldonado's co-defendant, stated:

> The government knew all of this when they put [Ramon Flores] on the stand. The government wanted you to believe he was and he had some bad spots in his background but. [sic] He has told you everything about himself and now he is telling you the truth unvarnished. You can bet on it. You can bite into it as if it was a peach. Was he telling you the truth or was he flat out lying to you? They signed

him up after this became known to them. The government
told you or - - withdrawn. The witnesses told you if they
ever lie on the witness stand their deal was going to be
ripped up. Has anybody heard a ripping sound?

Tr. 3271.


Additionally, defense counsel made several arguments
that put the content and timing of the cooperators' disclosures
during proffers directly at issue. For example, defense counsel
for Guerrero, attacked Ramon's credibility, stating that he had
not implicated himself in the murder of Feliz until after
several meetings with the Government. In response, the
Government presented the testimony of ATF Special Agent Charles
Mulham ("Special Agent Mulham"), who testified that Ramon had
discussed the Feliz murder during his first proffer. Tr. 2748-
49, 3168, 3302. In cross-examining Ramon, defense counsel for
Maldonado suggested that Ramon omitted his killing of a pregnant
woman from his description of past crimes. Again, the
Government responded with testimony from Special Agent Mulham,
who testified that defense counsel misread the proffer notes.
Then-counsel for Guerrero suggested that Martes manufactured his
testimony with the help of other co-conspirators in an effort to
frame the defendants. In response, Special Agent Mulham

testified that Martes provided detailed information regarding the murders immediately upon his arrest.

In light of these statements, AUSA Korenbaum's statements in the Government's rebuttal summation do not constitute improper vouching. The Second Circuit has held that the prosecution is permitted to argue vigorously for the jury to find its witnesses credible as long as it does not link its own credibility to that of the witnesses, United States v. Rivera, 971 F.2d 876, 884 (2d Cir. 1992), or imply the existence of extraneous proof supporting the witness' credibility, Modica, 663 F.2d at 1179. "[T]he government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." United States v. Carr, 424 F.3d 213, 227 (2d Cir. 2005); see also United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994) ("[W]e must evaluate the challenged remarks in the context of the trial as a whole, for the government is allowed to respond to argument that impugns its integrity or the integrity of its case.").

The strategy employed by defense counsel directly implicated the practice of proffering the cooperating witnesses. As such, the Government's rebuttal point was a proper response. See United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998) (observing that "what might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible reference to the evidence in the case"). The Government did not link its credibility to that of the witnesses, nor did it imply that it had evidence the jury did not receive. Instead, the Government was responding to the defendants' contentions concerning the conduct of Government agents in the proffering process, an issue the defendants themselves raised.

Additionally, the Government's comments were not improper because they primarily focused on the testimony of Special Agent Mulham. As mentioned above, AUSA Korenbaum stated: "But we don't simply take them at their word, ladies and gentlemen. You heard Special Agent Mulham testify in detail about the vetting process . . . We don't, Special Agent Mulham didn't just take Ramon Flores at his word or any of the other cooperating witnesses for that matter." Tr. 3299-3300. As such, the Government argued that Special Agent Mulham vetted the

witnesses.  Rather than link their own credibility to that of

the witnesses, the prosecutors limited their remarks to Special

Agent Mulham's testimony concerning the proffering process.


Even if it were concluded that AUSA Korenbaum's

statements during the rebuttal summation were improper, the

remarks do not constitute the "substantial prejudice" necessary

to warrant reversal.  See Shareef, 190 F.3d at 78 (holding that

prosecutorial misconduct is grounds for reversal "only if it

causes the defendant substantial prejudice so infecting the

trial with unfairness as to make the resulting conviction a

denial of due process.").  In evaluating whether a defendant has

suffered "substantial prejudice," the court considers "the

seriousness of the misconduct, the measures adopted by the trial

court to cure the misconduct, and the certainty of conviction

absent the improper statements."  United States v. Parker, 903

F.2d 91, 98 (2d Cir. 1990).  Even in a case of "serious

misconduct," "proper instructions by the trial court may suffice

to prevent undue prejudice and make the misconduct harmless."

United States v. Walker, 835 F.2d 983, 988 (2d Cir. 1987).

Here, following the conclusion of the rebuttal, the Court issued

the following jury charge:

> First, with respect to the summations and the government's
> rebuttal summation, some things I should tell you. The
> belief of counsel, either for the government or the
> defense, their personal beliefs, are not matters properly
> before you and can be disregarded and therefore various
> claims that they've made. It is the evidence that will
> control and you will decide the case based on the evidence
> and the credibility, not on issues of belief.

Tr. 3363.

As such, the jurors were instructed, immediately after the
challenged statements in the Government's rebuttal, that they
were the sole judges of credibility. The Court reiterated this
message twice in its instructions to the jury, stating, "As I
say, you are the sole judges of the facts and you decide the
credibility and the weight of the evidence," Tr. 3407, and
again, "The ultimate question for all witnesses is did the
witness tell the truth. It is for you to say whether the
witness was truthful, untruthful, in whole or in part," Tr.
3412. Even if the prosecutor's comments during her rebuttal
were improper, an immediate curative instruction was given to
prevent any undue prejudice. Maldonado's contention that the
prosecutor improperly vouched for the Government's witnesses
does not raise a real concern that an innocent person may have
been convicted. Accordingly, the allegedly improper remarks
made during summation do not constitute grounds upon which to
grant the defendant's motion Rule 33 motion for a new trial.

## C. The Government's Improper Attacks on the Credibility of Maldonado's Counsel

Maldonado's third argument in support of his motion for a new trial concerns what Maldonado characterizes as the Government's attack on his counsel's credibility. Prior to the trial, the Government furnished counsel for Maldonado with Jencks Act material pursuant to 18 U.S.C. § 3500, including notes of an April 3, 2006 interview of Ramon attended by Assistant U.S. Attorney Marcus Asner, Special Agent Mulham and an interpreter. The notes include an entry: "Danilo & Edwin & Hondo crowbarred door - - shot pregnant woman too." The Edwin referred to in the notes is not Edwin Maldonado. On direct examination, Ramon was asked whether anyone had been hurt in the robberies in which he had been involved, and Ramon answered in the negative. Tr. 284. On cross-examination, counsel for Maldonado asked whether a pregnant woman had been shot, Tr. 766-68, Ramon denied it and, when confronted with the notes, Ramon denied telling investigators that a pregnant woman had been killed in one of the robberies, Tr. 769. On re-direct, Ramon explained that he had told the agents that separately, apart from the robbery, the others had shot a pregnant woman. T. 896-

97. Special Agent Mulham verified Ramon's account. Tr. 2665-66.

Outside the presence of the jury, AUSA Korenbaum explained that counsel for Maldonado had misinterpreted the handwritten notes. Counsel accepted this representation, but asked that the Court make a statement to the jury lest the jury conclude that he had acted improperly in asking the question. The Court declined, expressing the view that defense counsel's credibility had not been tarnished by the incident. Tr. 2681-84. Special Agent Mulham, during his cross-examination, reiterated that Ramon was not involved in a robbery where a pregnant woman was shot. Although none of the three defendants discussed the issue in summation, the Government raised the topic in its rebuttal summation, arguing that defense counsel had attempted to "distract" the jury from the evidence:

> A perfect example of this at trial, ladies and gentlemen, the cross examination of Ramon Flores about the shooting of the pregnant woman. Now you heard Special Agent Mulham. Turns out that Ramon Flores was not even involved in that incident. . . . So given that history of very violent crime on the part of Mr. Flores, why focus on that incident, the shooting the pregnant woman to the exclusion of almost everything else it's because the defense, Mr. Buchwald, wants you to hate Ramon Flores so you will not listen to anything he says, so you will shut him out. And what better way to make you do that than the brand him with a scarlet "B" for baby killer? This is distraction, ladies

and gentlemen, and it's meant to focus you on something
other than the evidence.

Tr. 3300-01.  Counsel for Maldonado immediately objected and
made a motion for a mistrial, which was denied.  Tr. 3356-59.
Maldonado, in bringing his motion for a new trial, argues that
the prosecutor's suggestion that defense counsel had falsely and
intentionally tried to brand Ramon as a "baby-killer" was
grossly improper and denied Maldonado a fair trial.

        As discussed above, because rebuttal summation is most
often improvised, counsel is afforded some leeway.  Arias-
Javier, 392 Fed. Appx. at 898.  Furthermore, in determining
whether the Government's statements are inappropriate, a court
must consider the objectionable remarks within the context of
the entire trial.  Espinal, 981 F.2d at 666.  Here, Maldonado is
focusing on testimony and a remark that occupied mere moments of
a six-week trial.  While defense counsel characterizes these
statements as an attack on his credibility, considering these
statements in the context of Maldonado's trial strategy of
attacking the credibility of the Government's witnesses provides
some explanation for the prosecutor's remarks.

Even if AUSA Korenbaum's statements were improper, this misconduct can only be grounds for reversal if Maldonado suffered "substantial prejudice so infecting the trial with unfairness as to make the resulting conviction a denial of due process." Shareef, 190 F.2d at 78. Moreover, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11-12 (1985). In other cases involving more offensive conduct, the Second Circuit has held that a prosecutor's ad hominem attacks on defense counsel did not constitute grounds for overturning a jury's verdict. See, e.g. United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987) ("[W]e find no ground for reversal in the prosecutor's references to specific defense tactics as 'slick bits' and 'slyness' or in his statements that the defense engaged in 'sleight-of-hand' and tried to pull the wool over the jury's eyes."); United States v. Biasucci, 786 F.2d 504, 514 (2d Cir. 1986) (holding that prosecutor addressing defense counsel as "you sleaze," "you hypocritical son- --," and "so unlearned in the law" was improper, but that these remarks, rather than cause substantial prejudice were "inconsequential, isolated aberrations in a lengthy trial."). Maldonado's contentions concerning the "baby-killer" comment and the

perceived attack on defense counsel's credibility, if at all improper, do not rise to the level of substantial prejudice necessary for the defendant to obtain a new trial.

## D. **The Court's Denial of Maldonado's Request to Recall Ramon Flores**

Maldonado's final contention is that the Court should have permitted Maldonado to re-call Ramon to the stand after Leonardo's testimony. During the trial, the Court refused to allow the defense to recall Ramon for the intended purpose of establishing that he had told the prosecutor at his July 19, 2007 proffer session that after the Overman shooting he had gone to Queens to tell his brother Leonardo about the murder. Defense counsel argued that his failure to cross-examine Ramon about the statement during his initial cross-examination was excusable because Leonardo testified after Ramon and, rather than claiming to have been in Queens, said he had been in the Bronx.

At trial, one of the themes of the defense was that Leonardo, at his earlier 1996 Bronx County trial, would not have created the false alibi of meeting his wife at a subway station

near the murder scene in the Bronx if he had been in Queens with his wife at the time of the murder, and that Ramon and Leonardo had coordinated their testimony in the instant case. Prior to the trial, defense counsel had Special Agent Mulham's Grand Jury testimony and a statement attributed to Ramon in AUSA Korenbaum's handwritten notes from July 19, 2007 that were turned over as 3500 material. Both the Grand Jury testimony and the handwritten notes stated that Ramon went to Queens after the murder to inform Leonardo. In addition, the prosecution turned over notes from a July 20, 2007 meeting in which Leonardo stated that he was "home in Queens; comes back to block to do laundry with wife & daughter. 'Spanky' approaches and tells [defendant] 'they killed Boo []'". Any inconsistency in the brothers' testimony about a meeting in Queens was apparent, as was any discrepancy between the testimony at this trial and the testimony in Leonardo's Bronx County trial.

Leonardo testified that, on the day of the Overman murder, he left Queens and went to the Bronx. In his testimony, Special Agent Mulham acknowledged his Grand Jury testimony, believing it not inconsistent with Leonardo's trial testimony, and testified further that he did not recall Ramon saying that he went to Queens to tell his brother what had happened. The

37

defense sought to introduce evidence of Ramon's July 19, 2007 statement through AUSA Korenbaum's handwritten notes, verifying the notes either with AUSA Korenbaum's testimony or by stipulation. The Government objected on the grounds that Ramon had not been confronted with the notes. The defense then sought to recall Ramon for the purpose of confronting him with his prior statement. The Court refused to allow Ramon to be recalled.

Maldonado has contended that Ramon would have either admitted having made the statement at the July 19, 2007 proffer and would then have been asked why he tried to cover up Leonardo's presence in the Bronx, or he would have denied having made the statement in which case the extrinsic evidence that the statement was made should have been allowed. By not permitting Ramon to be recalled to challenge the credibility of the brothers' testimony, Maldonado claims that his defense was inappropriately limited.

A trial court has broad discretion in deciding whether to permit a party to recall a witness. United States v. Fabian, 312 F.3d 550, 558 (2d Cir. 2002), abrogated on other grounds by United States v. Parkes, 497 F.3d 220 (2d Cir. 2007). "The

court is accorded broad discretion in controlling the scope and extent of cross-examination." Rivera, 971 F.2d at 886. "[D]eference to the trial judge's discretion should be especially broad" in circumstances where counsel is seeking to recall the witness to examine him based on material already in counsel's possession during his earlier cross-examination of the witness. United States v. Blackwood, 456 F.2d 526, 529-30 (2d Cir. 1972).

At the time of the cross-examination of the Flores brothers, defense counsel had been in possession of the 3500 material, which included the July 19 and July 20 notes, for over six weeks. If Maldonado wanted to explore any inconsistencies between the Flores brothers' versions of the events on the day of Overman's murder, he had the opportunity to do so during his cross-examination of Ramon. Maldonado has contended that he had no notice that Leonardo would testify that he left Queens and went to the Bronx. However, the statements from the July 20, 2007 meeting that were included in the disclosed Jencks material. A comparison of the July 20, 2007 notes and Leonardo's trial testimony reveals no inconsistency. Although defense counsel describes Leonardo as having arrived in the Bronx "shortly after the shooting," there is no temporal element

to Leonardo's testimony, either in the July 20 notes or in the
record at trial. Although the defense has contended that the
notes from the July 19 meeting with Ramon state that Ramon
"immediately" went to Queens after the October 9, 1994 shooting
of Overman, the July 19 notes contain no temporal element.
While defense counsel has contended that the Flores brothers'
account of the events is inconsistent, this inconsistency
assumes a temporal aspect to the notes and testimony that was
not present. At most, a recall of Ramon might have exposed an
inconsistency between the brothers as to the location of the
conversation.

Defense counsel had been given notice through pretrial
disclosure of the 3500 material as to what Leonardo's testimony
would be, and Leonardo's testimony was consistent with the July
20 notes the Government provided. Using these July 20 notes,
the defense had all the information necessary in its possession
to cross-examine Ramon when he was on the witness stand about
what he did and did not tell the government at the July 19
meeting. To recall Ramon to explore the possibility of an
inconsistency as to the location of the conversation between
Leonardo and Ramon, which could have been explored on Ramon's

cross examination, did not warrant recalling Ramon to the witness stand.

As described above, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be manifest injustice" and "[t]here must be a real concern that an innocent person may have been convicted." Ferguson, 246 F.3d at 134. Because "competent, satisfactory and sufficient evidence" in the record supports the guilty verdict, Sanchez, 969 F.2d at 1414, Maldonado's motion for a new trial pursuant to Fed. R. Cr. P. 33 is denied.

## E. Sufficient Evidence Supports the Jury's Verdict

In evaluating a defendant's Rule 33 motion to set aside the verdict and obtain a new trial, the trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. Sanchez, 969 F.3d at 1414. The record in this case demonstrates such evidence to exist against Maldonado. Maldonado conceded in his opening statement that he worked for Solid Gold as a pitcher and manager. Both Rosa and Ramon testified that Maldonado was in Rosa's apartment on the morning of October 9, 1994, and that

41

Maldonado was wearing a dark hooded sweatshirt and that he left
the apartment on a bicycle. Rosa described how Maldonado was
fiddling with an item in his waistband that she assumed was a
gun. Ramon and Martes both testified that Maldonado had
committed the Overman homicide, with both witnesses testifying
that Maldonado had met with them and had described how he
approached Overman and Wade and shot Overman in the head.
Martes testified that Overman told him that he used a .357
caliber handgun and that, after Overman had been shot in the
head, brain matter had been scattered in the street, a fact that
crime scene photographs corroborate. Wade, who was standing
with Overman at the time of the shooting, demonstrated how the
murder was committed, and he testified that Maldonado was
jumping up and down before leaving the crime scene. Jose
Sanchez, another member of the Solid Gold crew, testified that
he heard about Maldonado's involvement in the murders through
Ramon, Omar and Martes.

           With respect to the Diaz homicide and non-fatal
shooting of Rodriguez, Calvin Cole, a witness to the Diaz
murder, testified that the shooter wore a dark colored hooded
sweatshirt and used a bicycle and provided a description similar
to that Rosa provided of the bicycle Maldonado used for the

42

Overman homicide. Ramon stated in his direct testimony that
Maldonado shot Diaz and Rodriguez, after Ramon, Omar, Padilla
and Cedeño planned the attack. Martes, in his testimony,
recalled a conversation at a store on Boston Road, in which
Ramon, Padilla, Cedeño and Omar planned the attack on Rodriguez,
and Martes further testified that Maldonado told him that he had
committed both the Diaz and Overman murders. Sanchez testified
that Ramon told him that Maldonado, using a 9 millimeter handgun
and riding a bicycle, had killed Diaz in his attempt to murder
Rodriguez. Police reports confirm that 9 millimeter spent
shells were discovered at the crime scene. Leonardo also
testified that, while he was incarcerated on Rikers Island
following his 1994 arrest, he spoke with Maldonado, who told him
that Rodriguez had survived the shooting, that Maldonado had
fled the scene on a bicycle and that Padilla had picked him up
in car.

In prescribing the standard to be applied to Rule 33
motions, the Second Circuit has held that "[t]he ultimate test
on a Rule 33 motion is whether letting a guilty verdict stand
would be manifest injustice," Ferguson, 246 F.3d at 134, and
that "[m]anifest injustice cannot be found simply on the basis
of the trial judge's determination that certain testimony is

untruthful, unless the judge is prepared to answer 'no' to the following question: 'Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" Sanchez, 969 at 1414. After examining the totality of the case and taking into account all facts and circumstances, see id., it is apparent that sufficient evidence exists to support the jury's guilty verdict. Accordingly, Maldonado's Rule 33 motion is denied.

**Defendant Guerrero's Motion for a Judgment of Acquittal or a New Trial Is Denied**

In his motion filed February 7, 2011, Defendant Guerrero moved, pursuant to Fed. R. Cr. P. 29 and 33, for a judgment of acquittal or, in the alternative, a new trial based on the following four arguments: (1) there was insufficient evidence to convict Guerrero; (2) Guerrero received ineffective assistance of counsel at trial; (3) the Court improperly allowed evidence of Guerrero's prior bad acts; and (4) Guerrero's conviction under 21 U.S.C. § 848(e) was defective because the statute of limitations had run on the underlying narcotics

conspiracy and the jury was not properly instructed on that charge.

## A. The Sufficiency of the Evidence Against Guerrero

Guerrero was convicted after a six-week jury trial of Counts One and Two of the Indictment, charging Guerrero with the September 3, 1994 murders of Ortega and Garrido.  In his motion for a judgment of acquittal or, in the alternative, for a new trial, Guerrero has contended that there was insufficient evidence to convict him of these crimes, first, because the Government's witnesses lacked credibility on account of their criminal histories, and second, because there were inconsistencies in the testimony of Ramon, Leonardo and Special Agent Mulham.

Calling the Government's witnesses a "gallery of rogues," Guerrero has contended that the witnesses against him had either perjured themselves in a state trial in the 1990s or had hired witnesses to lie on Leonardo's behalf in his Bronx County trial.  Guerrero asserts that Ramon admitted to having procured the false testimony of witnesses in order to protect the interests of both himself and his brother Leonardo.  Tr.

623.   Guerrero also highlights Ramon's admitted involvement in six murders, several armed robberies, crack cocaine sales, drug use and credit card theft.   Tr. 278-85.   Additionally, according to Guerrero, Ramon's testimony against Guerrero was materially the same as the testimony Ramon paid witness Ilar Chester to give falsely in favor of Leonardo at the Bronx County trial. Although Chester was not called as a witness at Guerrero's trial, Guerrero has contended that the fact Chester was paid for his false testimony in the state court case and the fact that Ramon's testimony is similar to Chester's fabricated testimony reveals that Ramon manufactured his testimony.   Guerrero also has attacked the credibility of Ramon and the Government's claim that when Ramon was extradited from the Dominican Republic on robbery, gun and narcotics charges, Ramon was unaware of the murder charges.   Referring to reports from Dominican newspapers regarding the homicide investigation, Guerrero has contended that Ramon was likely aware of the murder charges and that Ramon continued his effort, which had started a decade earlier, to trade his knowledge of the September 3, 1994 murders, for which his brother had been convicted, for his and his brother's freedom.

Guerrero has also challenged Leonardo's credibility, contending that he lied to the police about having an alibi, Tr. 1265, that he sold drugs and twice used marijuana in prison, Tr. 1291, that he would hide knives from prison guards, Tr. 1330, that he stabbed a man in prison, Tr. 1288, and that he spent 16 years in state prison under a false name. Tr. 1337. Guerrero has asserted that Government witnesses conspired to implicate Guerrero in a "blame-the-patsy" scheme.

In addition to attacking the credibility of the Government's witnesses, Guerrero's motion emphasizes contradictions in the testimony offered by the Flores brothers and Special Agent Mulham. While Ramon stated that Guerrero was dropped by car at Mama's Fried Chicken, Leonardo stated that Guerrero proceeded on foot. Additionally, Ramon stated that Guerrero's payment for the murders was permission to resell loose crack, while Leonardo described a cash payment of $3,000 or more. Special Agent Mulham, in an affidavit submitted to Supreme Court, Bronx County in support of a motion to vacate Leonardo's conviction, stated that, according to Leonardo, Ramon, Padilla and Guerrero were transported to the scene of the shootings in a white van, a statement inconsistent with the theory that Guerrero arrived on foot. Guerrero also describes

inconsistencies between Special Agent Mulham's testimony to the Grand Jury and his 440 affidavit submitted to the New York Supreme Court, Bronx County and contends that Special Agent Mulham's Grand Jury testimony concerning eyewitness Padilla's account regarding where Guerrero was standing when he fired the gun is inconsistent with the Crime Scene Unit report detailing the location where shell casings were recovered.  According to Guerrero, Special Agent Mulham's testimony is inconsistent, self-contradictory and raises serious doubt about the truthfulness of the Government's key witnesses.

As noted above, "a defendant making an insufficiency claim bears a very heavy burden."  United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002); United States v. Macklin, 927 F.2d 1272, 1277 (2d Cir. 1991).  A jury verdict must be upheld if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Autuori, 212 F.3d at 114 (2d Cir. 2000) (emphasis in original) (quoting Jackson, 443 U.S. at 319).  In a close case, where "'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'"  Autuori, 212 F.3d at 114 (quoting United States v.

Guadagna, 183 F.3d 122, 129 (2d Cir. 1999)) (internal quotation marks and brackets omitted).

In considering the sufficiency of the evidence, a court is tasked with "viewing all of the evidence in the light most favorable to the government." United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002); Morrison, 153 F.3d at 49. When evaluating competing interpretations of the evidence, the Court here must defer to the jury, as "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001). Evidence is analyzed "not in isolation but in conjunction," United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994), and the sufficiency test is applied "to the totality of the government's case and not to each element, as each fact may gain color from others," Guadagna, 183 F.3d at 130.

The deference accorded to the jury's verdict "is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a

surgeon's scalpel." United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal quotation marks and citations omitted). Conspiracies can be shown based on circumstantial evidence alone. United States v. Gordon, 987 F.2d 902, 906-07 (2d Cir. 1993); United States v. Miranda-Ortiz, 926 F.2d 172, 176 (2d Cir. 1991) ("Membership in the conspiracy may be proved entirely by circumstantial evidence.").

A "conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." United States v. Diaz, 176 F.3d 52, 92 (2d Cir. 1999) (internal quotations omitted). "Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency, and a challenge to '[t]he weight is a matter for argument to the jury, not a ground for reversal on appeal.'" Id. at 92 (quoting United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989)).

At trial, the Government presented testimony from four different witnesses who had direct knowledge of the murders or direct conversations with Guerrero to establish that Guerrero

was the sole shooter in connection with the murders on September 3, 1994. Ramon and Leonardo were both directly involved in ordering and carrying out the murders, and both pled guilty to their roles in connection with the crimes. While Guerrero questions the Flores brothers' credibility, their testimony is supported by Martes, who spoke directly to Guerrero about Guerrero's role as the shooter. Guerrero talked to both Ramon and Janita Rosa about his concerns that others would cooperate with the Government, expressing special concern about Padilla, the getaway driver who had been arrested by federal authorities, and Deborah Gonzalez, Leonardo's wife who saw Guerrero on the night of the murders and heard Guerrero tell the Flores brothers that he had shot Ortega.

The Government's witnesses were subjected to vigorous cross-examination at trial, with defense counsel repeatedly attacking the witnesses' credibility. Jurors were aware that they could accept or reject these witnesses' testimony. The Court cannot reject the jury's determination concerning the veracity of these witnesses' testimony, as "the credibility of witnesses is the province of the jury and [the court] simply cannot replace the jury's credibility determinations with [its] own." United States v. James, 239 F.3d 120, 124 (2d Cir. 2000).

While Guerrero's motion does highlight inconsistencies in the witnesses' testimony, these witnesses testified about years' worth of conduct and were describing events that occurred 15 years prior to trial. Additionally, counsel had the opportunity to explore these inconsistencies before the jury. It is well-settled law that "'to avoid usurping the role of the jury,'" Autuori, 212 F.3d at 114, a court must "'resolve all issues of credibility in favor of the jury's verdict.'" Desena, 287 F.3d at 177.

As described above, Guerrero has contended that since Ramon was aware of the murder investigation prior to his extradition, Ramon had time to manufacture a story to implicate Guerrero in the murders. It is undisputed that Ramon was extradited based on robbery offenses. Notwithstanding the Dominican newspaper article Guerrero cites, Special Agent Mulham, both in his affidavit filed in Supreme Court, Bronx County and in his trial testimony, stated that he was not investigating the 1994 murders at the time of the extradition. Guerrero has cited to Special Agent Mulham's April 7, 2009 Grand Jury testimony that Special Agent Mulham had been working on the homicide case since 2000, and Guerrero contends that Special

Agent Mulham was investigating the 1994 homicides at the time of the extradition. However, Special Agent Mulham described the homicide investigation as an "offshoot" of the investigation into Solid Gold that began in 2000.

Ramon testified that he contributed to Padilla's bail when Padilla was arrested on robbery charges in order to persuade Padilla not to provide information on the 1994 murders, and Ramon testified that when he spoke to Padilla while Padilla was on bail, Padilla lifted his shirt to show he was not wearing a recording device. Ramon's testimony also established that he spoke to Guerrero about Padilla's arrest and Guerrero expressed a similar concern, even stating that if he saw Padilla in Miami he would kill him to prevent him from putting Guerrero in prison for the murders. Thus, there was testimony at trial establishing that both Ramon and other Solid Gold members harbored concerns about law enforcement discovering their involvement in the 1994 murders. Regardless of the extradition issue, Guerrero suffered no prejudice because the jury was presented with evidence establishing Ramon's consistent fear that his involvement in the murders would be uncovered.

Guerrero's contentions concerning the witnesses'
credibility and the inconsistencies in their testimony are
insufficient to carry the defendant's "very heavy burden" of
proving it impossible for any rational trier of fact to have
found the essential elements of the crime beyond a reasonable
doubt.  Accordingly, Guerrero's Rule 29 motion for a judgment of
acquittal fails.  The strength of the evidence also quells any
suspicion that an innocent person may have been convicted or
that letting Guerrero's guilty verdict stand may result in
manifest injustice.  As such, Guerrero's Rule 33 motion for a
new trial is also denied.

## B. Guerrero's Ineffective Assistance of Counsel Claim

Guerrero also has contended that he received
ineffective assistance of counsel at trial.  Guerrero states
that his defense counsel failed to raise the multiple issues
highlighted above that would have impeached the testimony of the
Flores brothers and Special Agent Mulham and shown that their
version of the September 3, 1994 murders was unsupported by the
evidence, that defense counsel should have called Willie Henry,
a witness in the Bronx County trial and put into evidence a
death-bed statement by murder victim Garrido, both of which

would have undermined the testimony of Government witnesses and that defense counsel failed to pursue cross examination or otherwise present a defense showing that the version of events provided to Ilar Chester by Ramon was the same in key respects as the testimony Ramon gave at trial. Had defense counsel developed these facts at trial, Guerrero has contended that he likely would have been acquitted.

To prevail on a claim of ineffective assistance of counsel, a defendant bears the burden of proving two elements. First, the defendant must prove that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms," Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), overcoming a "strong presumption" that defense counsel's conduct fell within the broad spectrum of reasonable professional assistance, Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (citing Strickland, 466 U.S. at 689). Second, the defendant must "affirmatively prove prejudice," meaning that the defendant must demonstrate that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 693-94.

The defendant cannot meet the first prong of the Strickland test merely by showing that his counsel employed poor strategy or made a wrong decision. Instead, the defendant must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687. Courts should be "highly deferential" to a counsel's performance, as there are strong presumptions regarding the provision of legal representation, particularly with respect to strategic choices made by counsel. Id. at 689-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). A "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Merely disagreeing with counsel's strategy and finding it inadequate is not enough for a defendant to prevail on an ineffective assistance claim. See United States v. Sanchez, 790 F.2d 245, 253 (2d Cir. 1986) ("A

defendant, of course, may not claim ineffective assistance of counsel merely because in hindsight he thinks counsel's trial strategy was inadequate."); see also Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) ("counsel has wide latitude in deciding how best to represent a client"). It is an "objective review . . . measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Strickland, 466 U.S. at 688-89).

To meet the second prong of the Strickland test, the defendant must show that "[t]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Guerrero's argument regarding defense counsel's cross-examination of Government witnesses, an area that is within trial counsel's strategic discretion, fails to meet the requirements of the first prong of the Strickland test, as

Guerrero has not established that defense counsel's failure to
cross-examine the Government's witnesses concerning the
discrepancies Guerrero has identified was objectively
unreasonable. Guerrero has contended that, during his Grand
Jury testimony, Special Agent Mulham presented a version of
events different from that offered by the Flores brothers.
Ramon testified that Guerrero was dropped off near Mama's Fried
Chicken in close proximity to the murder scene. Leonardo
testified that he understood that Guerrero was going to go to
172nd Street and Minford Place on foot and further testified
that, right before the shooting, he saw Guerrero go toward his
home, which was on Boston Road between 173rd and 174th Streets, so
that he could go to the rooftop, emerge on 173rd Street, and make
his was to the murder location on Minford Place. Tr. 1238-40.
Special Agent Mulham testified to the Grand Jury that Padilla
dropped Guerrero off on the "other side of that wall" on Minford
Place, which a map depicting the scene reveals to be Boston
Road. The testimony of the Flores brothers that Guerrero
traveled a short distance by foot to the murder location is
consistent with Special Agent Mulham's Grand Jury testimony.
Regarding the inconsistencies concerning Guerrero's payment,
Ramon recalled Guerrero being paid in crack while Leonardo
recalled Guerrero being paid $3,000 in cash, but these details

are not necessarily inconsistent.  Defense counsel's decision

not to cross-examine the Government's witnesses on these points

cannot be said to be objectively unreasonable conduct.


While Special Agent Mulham's affidavit in Supreme

Court, Bronx County stated that Guerrero drove to the crime

scene and his Grand Jury testimony stated that Guerrero arrived

on foot, defense counsel's decision not to cross-examine Special

Agent Mulham on the affidavit represented a strategic decision.

Introducing this evidence would have allowed the Government an

opening to have Special Agent Mulham explain the sources of his

information that Guerrero had been dropped off some distance

away from the murder site.  One of those sources was Padilla, a

non-testifying cooperator, who provided Mulham with information

about the murder, including the fact that Guerrero was dropped

off near the murder site shortly before the crimes were

committed.  Padilla also told Mulham how he transported Guerrero

from the murder scene and how he saw Guerrero, through his side

view mirror, shoot the victims.  Such testimony would have

bolstered the Government's case, and defense counsel's decision

not to challenge the basis for Special Agent Mulham's testimony

was a reasonable decision.

There is also a strategic justification for defense counsel's decision not to call Willie Henry or introduce Garrido's death-bed statement. Henry's testimony and Garrido's statement that the shooter arrived at the crime scene in a white van, not on foot, would have also corroborated certain details of the Government's case, as both witnesses would have confirmed that a white van was involved. Given these strategic considerations, Guerrero's arguments regarding defense counsel's failure both to cross-examine witnesses on perceived inconsistencies and present additional witnesses fails to meet the first prong of the Strickland test.

Even if Guerrero's contentions concerning the testimony of the Flores brothers, Mulham, Henry and Garrido did fulfill the first prong of the Strickland test, Guerrero's ineffectiveness claim does not establish substantial prejudice. Janita Rosa, Martes and the Flores brothers all testified, based on their own knowledge or on statements Guerrero made to them, that Guerrero, a member of Solid Gold, agreed with other Solid Gold members to kill Ortega and Garrido with whom Solid Sold had an ongoing drug-related dispute, armed himself with a gun, obscured his face with a hooded sweatshirt, shot Ortega and Garrido and then fled in a white van driven by Padilla. Given

this general agreement among the Government's witnesses concerning the theory of the crime, Guerrero has failed to establish that the verdict would have been different had defense counsel cross-examined Government witnesses on the means by which Guerrero arrived on the scene or the manner in which he was paid.

In addition to arguments regarding the Flores brothers, Mulham, Henry and Garrido, Guerrero has contended that his trial counsel was ineffective for failing to pursue the alleged similarity between Ilar Chester's perjured eyewitness testimony at the Bronx County trial and Ramon's testimony in the instant action. Guerrero's contention is that if his counsel had pursued this similarity, it would have revealed that Ramon's testimony in the Guerrero trial, like Chester's testimony in the Bronx County trial, was false and that Ramon had concocted the same false story for each occasion.

As an initial matter, it should be noted that Chester's testimony during the Bronx County and Ramon's testimony during the instant action were not identical. Chester was paid to testify falsely that he saw the shooter and that it was not Leonardo; Ramon testified that the shooter was Guerrero.

Both Janita Rose and Jose Sanchez testified that they were present when Ramon instructed Chester to say he saw the shooter and that it was not Leonardo, not that the shooter was Guerrero. Additionally, the fact that some of the details in Chester's manufactured testimony match up with Ramon's testimony is not surprising, as Ramon testified that he saw the shooting occur and could have provided these details to Chester.

Applying the second prong of the Strickland test, Guerrero cannot be said to have suffered prejudice on account of defense counsel's failure to pursue this specific argument. Throughout the trial, counsel presented the theory that Guerrero has emphasized in this motion, namely that Ramon lied to absolve his brother and pin the September 3, 1994 murders on Guerrero. See, e.g. Tr. 3160 ("[T]he crux of what I am going to argue to you is the big and simple lie."); Tr. 3161 ("Others told you [about] false alibis and false testimony in other cases which was carefully coordinated and presented in a court of law"); Tr. 3182 ("Ramon Flores has managed to fool everyone.")).

Because Guerrero has failed to establish defense counsel's to be objectively unreasonable, and because any alleged deficiencies in representation cannot be said to have

caused prejudice to the extent that, but for counsel's unprofessional errors the result of Guerrero's trial would have been different, Guerrero's ineffective assistance of counsel claims fail.

## C. Introducing Evidence of Guerrero's Prior Bad Acts

A third claim Guerrero raises in support of his motion for a new trial is that the Court improperly allowed evidence of Guerrero's bad acts. Guerrero objects to the admission of evidence related to three specific uncharged acts: (1) the attempted murder of rival drug dealer "Amadito" by Guerrero and Leonardo; (2) Guerrero's purported involvement with other Solid Gold members in shooting at a bodega from the top of his building; and (3) Guerrero's early robberies with Leonardo.

Guerrero's argument is that introducing uncharged prior conduct prejudiced Guerrero because those actions were part of a separate conspiracy and the jury was improperly influenced by the large number of violent incidents. The defendant claims that these acts predated a turning point in 1993 when the conspiracy shifted to a drug distribution conspiracy, and, accordingly, testimony as to these shootings

and gun battles were inadmissible and that prior to 1993 there was no large quantity of crack cocaine sales, thereby removing any motivation to displace competing drug dealers. Guerrero contends that introducing this evidence was therefore in error, the jury was unduly influenced by the large number of murders and the verdict should be set aside.

All of the evidence Guerrero has challenged was offered as proof of the existence of the Solid Gold narcotics conspiracy, which conducted its business at 173rd Street and Boston Road. Evidence of uncharged conduct is admissible to establish the existence of a conspiracy. See United States v. Thai, 29 F.3d 785, 812-13 (2d Cir. 1994) (evidence of uncharged robberies and assaults is admissible as direct evidence to show the "existence and structure" of the conspiracy); United States v. Conception, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."). Furthermore, evidence related to the defendants' prior illicit transactions with their co-conspirators, including shootings of drug rivals, possession of guns belonging collectively to the Solid Gold crew, robberies of drug customers and their knowledge

of and acquiescence in the murder of Jimmy Feliz is plainly admissible to explain the development of the illegal relationship between the defendants and their co-conspirators and explain he mutual trust that existed between the co-conspirators (including the cooperating Government Witnesses).

The Second Circuit had adopted an "'inclusionary' approach" under which "'evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity.'" United States v. Brennan, 798 F.2d 581, 589 (2d Cir. 1986) (quoting United States v. Harris, 733 F.2d 994, 1006 (2d Cir. 1984)). It is debatable whether the evidence Guerrero challenges even constitutes evidence of "other crimes," as evidence of uncharged criminal activity is not considered "other crimes" evidence under Fed. R. Evid. 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, or if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989).

The prior dealings among the defendants and their co-conspirators provided the explanation for the murders that were the subject of the Indictment. Evidence of the violent conflicts between Solid Gold and its rivals at the drug spot on Boston Road, in the course of which Solid Gold members including Guerrero and Maldonado took steps to maintain control of the turf, was linked with the other evidence about the charged crimes. This evidence explained the relationship of trust among the co-conspirators, and the defendants' histories of committing violent crimes to protect Solid Gold's drug interests was admissible as direct evidence of the conspiracy. See Fabian, 312 F.3d at 557 (affirming admission of prior drug dealing convictions in a robbery case where the evidence showed the co-conspirators' "long-standing friendship" and "made the allegation that [one co-conspirator] had served as a tipster for the robbery more likely"); see also United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged in order to provide background for the events alleged in the indictment.").

In addition, some of the evidence to which Guerrero objects was properly admitted because several of the

Government's witnesses at trial participated in these acts.
Accordingly, the Government was required to appraise the
defendants of these acts, see United States v. Bagley, 473 U.S.
667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), Giglio v. United
States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and
the Government was permitted to elicit the witnesses' testimony
about the acts "to avoid the appearance that it [is] concealing
impeachment evidence from the jury." Coonan, 938 F.2d at 1561;
United States v. Louis, 814 F.2d 852, 856 (2d Cir. 1987).

The evidence relating to the uncharged crimes was also
admissible under Fed. R. Evid. 404(b) and 403, either to rebut
any claim that Guerrero lacked the requisite knowledge or intent
to commit the charged crime, or to prove his motive,
opportunity, preparation, plan, identity or absence of mistake
or accident. As stated above, the Second Circuit has adopted an
"inclusionary approach" to the admission of evidence of prior
crimes, holding that such evidence is admissible for purposes
other than to show a defendant's criminal propensity. United
States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996). Under
Rules 404(b) and 403, evidence of prior acts is admissible if it
is (1) advanced for a proper purpose; (2) relevant to the crimes
for which the defendant is on trial; (3) more probative than

prejudicial; and (4) if requested, admitted subject to a limiting instruction. See Zackson, 12 F.3d at 1182; United States v. Ramirez, 894 F.2d 565, 568 (2d Cir. 1990) (citing Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)).

The evidence related to the uncharged crimes was advanced for a proper purpose, namely to demonstrate the nature, existence and background of the narcotics conspiracy that was an element of the murder counts against Guerrero and to show a prior course of dealing between Guerrero and his co-conspirators. The jury was given a specific instruction related to the jury's consideration of these events: "Let me remind you that the defendants are on trial only for the acts alleged in the indictment. Accordingly, you may not consider this evidence of similar acts as a substitute for proof that a defendant committed the crimes charged. Nor may you consider this evidence as proof that a defendant has criminal personality or bad character." Tr. 3419. The Court further cautioned: "[T]he evidence of similar conduct is to be considered by you only on the issues I have just mentioned, not on any other issues. You may not consider such evidence for any other purpose. You may not consider it as evidence that the defendant is of bad

character or has a propensity to commit crime." Tr. 3420. As such, the evidence relating to the uncharged conduct was appropriately limited and admitted for a proper purpose.

Guerrero's contentions that Solid Gold crew, changed the color of its crack vials and sold more crack does not detract from the fact that it was an on-going narcotics conspiracy with a consistent membership that controlled a specific drug selling location. The evidence to which Guerrero objects establishes that Solid Gold's membership involved the same individuals implicated in the 1994 murders and that the gang used violence against a rival drug dealer. As such, this evidence established Guerrero to be an integral part of the narcotics conspiracy that motivated the September 3, 1994 murders.

The evidence relating to the uncharged crimes was more probative than prejudicial. The evidence presented was probative of the charges in the Indictment, in that it was necessary to explain the background of the charged acts and the relationships among the co-conspirators. Given the fact that these acts were part of Guerrero's participation in the charged

conduct, admission of the evidence did not result in prejudice that outweighed the evidence's probative value.

The crimes to which the evidence related were less sensational than the September 3, 1994 murders, reducing any danger that the admission of this evidence would inflame the jury. See Pitre, 960 F.2d at 1120 (in narcotics case, evidence of prior narcotics transactions admitted where these other acts "'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'") (quoting United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)). Additionally, as described above, the Court issued a limiting instruction concerning this evidence relating to Guerrero's prior acts. Especially in light of the Court's limiting instruction, the evidence of the prior uncharged crimes was more probative than prejudicial. Considering Guerrero's contentions in light of the applicable Rule 33 standard, letting Guerrero's guilty verdict stand would not represent a manifest injustice nor is there a real concern that an innocent person has been convicted.

**D. Guerrero's Conviction Under 21 U.S.C. § 848(e)**

70

Guerrero's final contention as to why he should obtain a new trial is that his conviction under 21 U.S.C. § 848(e) was defective because the statute of limitations had run on the underlying narcotics conspiracy, and the jury was not properly instructed on that charge. Guerrero has contended that he was convicted of knowing and intentionally killing "while engaged in an offense punishable under Section 841(b)(1)(A) of Title 21" of the United States Code, in violation of the second prong of 21 U.S.C. § 848(e)(1)(A). As a predicate for this Count, the Indictment charged the defendants with participating in a conspiracy punishable under § 841(b)(1)(A), and, in order to establish guilt as to this second prong, the Government must show the defendant to be guilty of a narcotics conspiracy. Guerrero notes that, in the Government's Memorandum of Law in Support of Motions In Limine filed March 18, 2010, the Government conceded that Guerrero had "ceased involvement" in the Solid Gold narcotics conspiracy in 1995. Accordingly, Guerrero reasons that, by the time the Indictment was filed in 2009, the five-year statute of limitations governing the narcotics conspiracy had expired. See 18 U.S.C. § 3282. As such, Guerrero has contended that the Government was barred from introducing proof of the narcotics conspiracy and could not have established whether Guerrero was "engaged in" " an offense

punishable under Section 841(b)(1)(A) of Title 21" as required to prove a violation of the second prong of 21 U.S.C. § 848(e)(1)(A).

Guerrero has also contended that, in order to establish guilt under the second prong of 21 U.S.C. § 848(e)(1)(A), the Government was required to show that Guerrero was guilty of a narcotics conspiracy and that the conspiracy involved at least 50 grams or more of crack cocaine. As such, Guerrero contends that the jury was improperly charged and could not have, based on the lack of a substantive narcotics conspiracy charge, adequately considered whether or not there was sufficient evidence of each of the elements of narcotics conspiracy that was the predicate for the offense charged under 21 U.S.C. § 848(e)(1)(A). Guerrero contends that this violated his Due Process rights under the Fifth Amendment.

While Guerrero is correct that the five year statute of limitations on the narcotics offense had expired, there is no statute of limitation for drug-related intentional murders, the crimes with which Guerrero was charged. Federal courts have rejected Guerrero's argument that the narcotics conspiracy underlining the § 848(e) charge must fall within the five year

limitations period.  See <u>United States v. Dames</u>, No. 04 CR. 1247

PAC, 2007 WL 1032257 (S.D.N.Y. Mar. 30, 2007) (violations of

Title 21 U.S.C. § 848(e)(1)(A) "are not subject to a statute of

limitations, regardless of whether the underlying narcotics

conspiracy, if charged separately, would be time-barred");

<u>United States v. Martinez-Martinez</u>, No. 01 CR 307, 2001 WL

1287040, at *2-3 (S.D.N.Y. Oct. 24, 2001) ("the phrase 'an

offense punishable under section 848(b)(1)(A),' appears on its

face to mean that the drug offense that serves as a predicate

under § 848(e)(1)(A) must be of the type proscribed by §

848(b)(1)(A), that is, a drug offense involving the requisite

quantity of drugs," and not that the drug offense be "currently

punishable").


    In support of his contention concerning the statute of

limitations, Guerrero cites the case of <u>United States v. Jordan</u>,

509 F.3d 191 (4th Cir. 2007).  However, <u>Jordan</u> does not deal

with the issue of the statute of limitations for § 848(e)

offenses.  In <u>Jordan</u>, the defendant was indicted in the Eastern

District of Virginia in 2004 for, <u>inter alia</u>, a drug-related

murder pursuant to 21 U.S.C. § 848(e), and he was later

convicted at trial.  The Fourth Circuit subsequently overturned

the conviction on the basis of a prior plea agreement entered

into between the defendant and the Government under which the
defendant pled guilty to a narcotics conspiracy spanning a time
frame that included the period during which the murder occurred.
In reversing the defendant's conviction, the Fourth Circuit
pointed to the immunity paragraph in the 2002 plea agreement and
found that, under the terms of the agreement, the Government
could prosecute the defendant for crimes "related" to those
charged in the original indictment so long as doing so did not
require the Government to prove the conduct underlying the
conspiracy count in the indictment as an element of the
"related" crimes.  Id. at 196.  The Court rejected the
Government's argument that Gordon's prosecution for the murder
charged in a subsequent indictment did not violate the terms of
the plea agreement because those crimes were not charged in the
original indictment.  As such, the Jordan case is one that
interprets the terms of a plea bargain, not one that temporally
limits the Government's ability to prosecute drug-related
murder.


          Guerrero has also contended that the jury was
improperly charged.  However, the jury received a full and
complete charge on all the elements of the narcotics conspiracy
element.  See Tr. 3369-83.  The jury was specifically instructed

that it had to determine that the Government proved each and every element of the charged offenses, including the narcotics conspiracy element of the murder charges, beyond a reasonable doubt. Tr. 3368-69. As such, there was no defect in the jury instruction concerning the narcotics conspiracy element of Counts One and Two.

### E. Sufficient Evidence Supports the Jury's Verdict

As described above, in order to grant a defendant's Rule 33 motion to set aside the jury's verdict and order a new trial, a court must determine that the jury's verdict is unsupported by "competent, satisfactory and sufficient evidence." Sanchez, 969 F.2d at 1414. Here, the trial record includes testimony from numerous witnesses who, through their direct knowledge or through conversations with Guerrero, established Guerrero to be the perpetrator of the September 4, 1994 murders of Ortega and Garrido. Ramon and Leonardo, who were both directly involved in planning the murders, named Guerrero as the shooter, and their testimony was corroborated by Martes, who heard directly from Guerrero that he had done the killing. Guerrero also voiced his concerns to both Ramon and Janita Rosa that Padilla and Leonardo's wife might identify him

to the police.  Because the trial record includes sufficient evidence supporting the jury's finding of guilt beyond a reasonable doubt, Guerrero's Rule 33 motion is denied.

**Conclusion**

Based upon the conclusions set forth above, the defendants' motions are denied.

It is so ordered.

**New York, NY**
**December  /  , 2011**

ROBERT W. SWEET
U.S.D.J.