UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

EDWIN MALDONADO,

         Defendant.

------------------------------------X

09 Cr. 339-02

SENTENCING OPINION

**Sweet, D.J.**

      On June 4, 2010, Edwin Maldonado, ("Maldonado" or the "Defendant") was found guilty of two counts of intentional murder while engaged in a drug trafficking crime, in violation of 21 U.S.C. § 848(e)(1)(A), two counts of death through the use of a firearm, in violation of 18 U.S.C. § 924(j), and two counts of use of an interstate commerce facility in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958.  For the reasons set forth below, Maldonado will be sentenced to life imprisonment and five years' supervised release on each count, with the sentences to run concurrently to each other along with any sentences Maldonado is currently serving.  Maldonado is also required to pay a special assessment of $600.

1

## Prior Proceedings

On April 7, 2009, Indictment 09-CR-339 (RWS) was filed in the Southern District of New York. This case arises out of the prosecution of members of the Solid Gold drug organization for the September 3, 1994 murders of Livino Ortega ("Ortega") and Fernando Garrido ("Garrido"); the October 9, 1994 murder of Leonard Overman ("Overman") and non-fatal shooting of Alvino Wade ("Wade"); and the December 13, 1994 murder of Carmen Diaz ("Diaz") and non-fatal shooting of Genero Rodriguez ("Rodriguez").

Count 1 charges that on September 3, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Antonio Guerrero ("Guerrero"), and others, intentionally and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Ortega in the vicinity of Minford Place and East 173rd Street, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 2 charges that on September 3, 1994, in the

2

Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Guerrero, and others intentionally and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Garrido, in the vicinity of Minford Place and East 173rd Street, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 3 charges that on October 9, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Maldonado, Omar Flores ("Omar"), and others intentionally and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Overman, in the vicinity of Crotona Park and Southern Boulevard, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 4 charges that on October 9, 1994, in the Southern District of New York, Maldonado, Omar, and others, during and in relation to a conspiracy to distribute and possess

3

with intent to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," did use and carry a firearm, and, in furtherance of such crime, Omar provided Maldonado with a handgun, which Maldonado used to shoot and kill Overman, in the vicinity of Crotona Park and Southern Boulevard, Bronx, New York, in violation of 18 U.S.C. § 924(j).

Count 5 charges that from the fall of 1994 up to and including December 13, 1994, in the Southern District of New York and elsewhere, Omar and Johnny Cedeño ("Cedeño") agreed with others to pay Maldonado to kill Rodriguez in exchange for currency and other things of pecuniary value, and in the course thereof did communicate through a facility of interstate commerce, which resulted in the non-fatal shooting of Rodriguez and the shooting death of Diaz in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 18 U.S.C. § 1958.

Count 6 charges that from the fall of 1994 up to and including December 13, 1994, in the Southern District of New York, Omar and Cedeño paid Maldonado to kill Rodriguez and in the course thereof did communicate through a facility of interstate commerce, after which Maldonado shot Rodriguez and

4

shot and killed Diaz, in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 18 U.S.C. § 1958.

Count 7 charges that on December 13, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute and to possess with intent to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Maldonado, Omar, Cedeño, and others intentionally and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Diaz, in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 8 charges that on December 13, 1994, in the Southern District of New York, Maldonado and others during and in relation to the conspiracy to commit murder-for-hire charged in Count 6 of the Indictment and the intentional killing of Diaz charged in Count 7 of the Indictment, and during and in relation to a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," in the Bronx, New York, did use a semi-automatic handgun to shoot and kill Diaz in the

5

vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 18 U.S.C. § 924(j).

Sentencing is scheduled for March 22, 2012.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   the need for the sentence imposed —

        (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)   to afford adequate deterrence to criminal conduct;

        (C)   to protect the public from further crimes of the defendant; and

        (D)   to provide the defendant with needed educational or vocational training, medical

> care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for —
>
>    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
>
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.

## The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Maldonado's personal and family history.

**The Offense Conduct**

        The following description draws from the PSR.   The
specific facts of the underlying conduct are adopted as set
forth in that report.

**A. Background**

        In the early to mid 1990s, Maldonado and Guerrero were
members of a crew that ran a retail crack cocaine spot at 173rd
Street and Boston Road in the Bronx.   The spot was "owned" by
Ramon Flores ("Ramon") and his identical twin brothers, Omar and
Leonardo Flores ("Leonardo").   The crew called itself "Oro
Solido," or "Solid Gold," after a song that was then popular in
the Dominican community, and which was also a reference to the
gold caps the crew used on their crack vials.   Solid Gold ran
the Boston Road spot from roughly 1992 to 1997.

        At its peak, the Boston Road spot sold approximately a
kilogram of crack cocaine a week.   Solid Gold employed numerous
persons at the spot, including managers who ran the day to day
drug business, stash house workers who bagged up the crack in
individual packets and bundles so it could be sold to Solid

Gold's customers, and "pitchers," who conducted the actual sales of crack cocaine at the drug spot. Guerrero worked steadily for approximately two years as a manager for Solid Gold. Maldonado worked for Solid Gold for a shorter period of time as a pitcher and sometimes manager.

During the course of its existence, Solid Gold maintained a number of stash houses which members used to store crack cocaine and numerous firearms. Guerrero's apartment, which was in a building directly across the street from the spot used to conduct the drug sales, was used principally to store firearms. The firearms were kept in a closet in Guerrero's apartment and were accessible to members of Solid Gold. The firearms were used by various members of Solid Gold including Guerrero, Maldonado, Omar and Leonardo, to intimidate, threaten and murder Solid Gold's drug rivals. Members and associates of Solid Gold committed five murders and numerous shootings in 1994 to protect its drug turf at 173rd Street and Boston Road.

## B. The Murder of Jimmy Feliz on Boston Road and 173rd Street

On January 11, 1994, Jimmy Feliz, a/k/a "Jimmy Felix," a/k/a "Jimmy Arias," was gunned down in front of 1685 Boston

Road in the Bronx. Feliz had recently been released from prison and had been attempting to regain control of the crack spot he had previously run with Ramon at 173rd Street and Boston Road, which was now being run by Solid Gold. Ramon and other members of Solid Gold, including Leonardo and Guerrero, agreed that Feliz should be killed so that they could continue to control the spot. Ramon, Leonardo and another member of Solid Gold arranged for a gunman in the Bronx to commit the murder. They agreed to pay the hired assassin and provided him with a .357 firearm to commit the murder. Feliz was shot multiple times near a bodega on 173rd Street and Boston Road. After the murder, Solid Gold owned the drug spot exclusively.

## C. The Murders of Ortega and Garrido on Minford Place

On September 3, 1994, Ortega, a crack dealer, and his friend, Garrido, were shot as they stood near a gas station on Minford Place and 173rd Street in the Bronx, within 100 feet of Solid Gold's drug spot. Both Ortega and Garrido died as a result of their gunshot wounds.

The Solid Gold crew had been having problems with Ortega, who was selling crack cocaine in close proximity to the

Solid Gold spot and who was directly competing with Solid Gold for customers. As a result, members of the Solid Gold crew had several confrontations with Ortega. Solid Gold was also having problems with Overman, a/k/a "Boo," who had owned the Solid Gold drug spot before Solid Gold's predecessor, Jimmy Feliz. Since being released from jail, Overman had made it clear that he wanted the drug spot back for himself and his partner, Wade. Things became so heated that, at one point, Ramon, Leonardo and Guerrero armed themselves with guns and prepared to shoot at Overman and Wade from the rooftop of 1669 Boston Road. Guerrero, who was on duty as a manager that day, left to attend to the spot shortly before the Flores brothers shot at Wade as he walked below in the street. The attempt to shoot Wade was unsuccessful as he managed to evade the gunfire and get away.

On the day Ortega and Garrido were killed, members of Solid Gold, including Miguel Padilla ("Padilla"), Ramon, Leonardo and Guerrero sought out Overman to kill him. Their plan was prompted when Overman assaulted one of the Solid Gold workers at the drug spot. When the crew was unable to find Overman that day, however, they returned to Boston Road. Once there, the crew decided that, since they were armed and prepared, they might as well take the opportunity to kill

Ortega.

In preparation for the anticipated shooting of Overman, Guerrero had armed himself earlier that day with a 9 millimeter firearm, which he had retrieved from his apartment on Boston Road. Guerrero, his face obscured by the hood of his sweatshirt, walked to the corner of 173rd Street and Minford Place and shot Ortega in the head at close range. Guerrero then shot Garrido, who had been standing with Ortega, in the back. Guerrero then got into a white van that was waiting for him down the block. Padilla, who was in the driver's seat, drove a few blocks away, where Padilla and Guerrero regrouped with Ramon and Leonardo, who were waiting there in Leonardo's burgundy car. Guerrero got in the burgundy car and announced that "I killed him." Leonardo then drove away. Ortega, who sustained three gunshot wounds, died on the spot. Garrido, who sustained a single gunshot wound to the back, died some hours later at a hospital in the Bronx.

**D. The Murder of Overman and the Non-Fatal Shooting of Wade on Southern Boulevard**

A couple of weeks after the murders of Ortega and

12

Garrido, the crew renewed its efforts to kill Overman and his partner, Wade. Padilla recruited Maldonado to commit the murder. On the morning of the murder, October 9, 1994, Ramon, Padilla and Maldonado met at the apartment of Ramon's girlfriend, which was a short distance from the spot on Southern Boulevard where Overman regularly sold marijuana. Maldonado was wearing a sweatshirt with a hood tied tightly around his face. Maldonado had been given a .357 caliber revolver by members of Solid Gold.

After confirming that Overman was at his spot on Southern Boulevard, Maldonado, Padilla and Ramon left the apartment, and Maldonado got on a dirt bike and proceeded to Overman's drug spot. Maldonado later described to the crew members how he murdered Overman and shot Wade. According to Maldonado, the shot to Overman's head was so powerful that Overman's brains splattered in the street. Overman was killed but Wade survived.

### E. The Trial and Conviction of Leonardo for the Murders of Ortega, Garrido and Overman

On October 12, 1994, Leonardo, a/k/a "Roberto

Mercado," was arrested and ultimately charged with the murders of Ortega, Garrido and Overman. Leonardo was convicted based almost exclusively on the testimony of three eyewitnesses to the murders, all of whom testified that they saw Leonardo shoot the victims at point blank range. Ultimately, the two living eyewitnesses recanted their testimony to federal agents who were re-investigating the murders.

One of the living eyewitnesses, Omar Camacho, who was sixteen years old at the time Ortega and Livino were murdered, had initially claimed - and testified at the state trial - that he saw the shooting, saw the shooter's face and knew who the shooter was. Camacho later admitted that he never saw a shooter at all and had made up the version of events he later told to the police at the urging of his stepfather. The other living eyewitnesses, Wade, later admitted that although he was in close proximity to the shooter, he could not, in any event, make an identification because the shooter's face was almost entirely obscured by the hood of his sweatshirt. Wade further admitted that, although he never saw the shooter's face, he had no problem implicating Leonardo because he knew that the shooter was a member of Solid Gold and he did not particularly care which crew member went to prison for the murder.

The third eyewitness, Ruben Negron, who has since died, claimed that he was able to identify the shooter from his parking lot, approximately 180 feet away from the shooting, despite the fact that the shooter had a hood on his head. In addition, Negron's version of events changed substantially over time. For example, Negron failed to inform the police in his initial statement that he knew the shooter, a claim he only made after viewing an array containing a photograph of Leonardo, who was known to him as a neighborhood thug. Negron also failed to tell the authorities, until days before the trial commenced a year and a half later, that the shooter had on one occasion threatened Negron with a gun and claimed that he killed people for a living.

Camacho, Negron and Wade all testified against Leonardo at his trial in 1996. There was no physical evidence connecting Leonardo to the murders. Leonardo was convicted of three counts of murder, plus the non-fatal shooting of Wade. He was sentenced to 25 years to life on each murder count, the sentences to run consecutively.

As a result of evidence developed during the federal

investigation into the murders of Ortega, Livino and other homicides committed by the Solid Gold crew, including the recantations of Wade and Camacho, Leonardo, through counsel, made a motion to set aside the New York State convictions based on newly-discovered evidence. The motion was granted. Leonardo's prior convictions were vacated, and he pleaded guilty in state court to the September 3, 1994 murders of Ortega and Livino as an accessory.[1] He was sentenced to 15 years to life in state prison.

## F. The Murder of Diaz and the Non-Fatal Shooting of Rodriguez on Bathgate Avenue

On December 13, 1994, Diaz, a young teenager, was shot and fatally wounded on Bathgate Avenue in the Bronx by Maldonado. In September 1994, Cedeño, an associate of members of Solid Gold, pled guilty to criminal possession of a weapon in the second degree and was sentenced to three to six years of incarceration. At the time of his arrest, Cedeño ran a retail crack cocaine spot in the vicinity of Bathgate Avenue and 178th

---

[1] There was no evidence that Leonardo was involved, other than as a conspirator, in the murder of Overman. In fact, Leonardo and other witnesses stated that he was in Queens when Overman was killed.

Street in the Bronx and was involved in an ongoing turf war with Rodriguez. Rodriguez sold heroin on the same block as Cedeño. At the time, Rodriguez lived at 1993 Bathgate Avenue with his girlfriend and her daughter, Diaz.

Cedeño had a close relationship with members of Solid Gold. In fact, Cedeño taught Ramon how to efficiently cook crack cocaine. Moreover, prior to Cedeño's arrest, members of Solid Gold provided Cedeño with the crack he sold on Bathgate Avenue. After Cedeño's arrest, Solid Gold essentially ran Cedeño's crack business at Bathgate Avenue for Cedeño. While Cedeño was serving his sentence, he and members of Solid Gold arranged for Rodriguez to be killed and for Solid Gold to continue selling crack at Cedeño's spot. Maldonado was recruited to do the murder because Cedeño admired the way in which he had killed Overman. Members of Solid Gold, Ramon, Omar and Padilla, traveled to Orleans Prison in upstate New York where they met with Cedeño to discuss and plan the murder of Rodriguez and the arrangements to pay Maldonado to commit the crime. The Flores brothers and Padilla also spoke frequently to Cedeño by phone in the days leading up to the Bathgate shootings, using the telephone of one of Cedeño's closest drug associates.

On the day of the shootings, Maldonado proceeded on a bicycle towards Bathgate Avenue. He approached Rodriguez, who was standing in front of 1993 Bathgate Avenue. Diaz was in the vestibule of the building. Using a gun provided to him by Solid Gold, Maldonado shot both Rodriguez and Diaz numerous times. On January 1, 1995, about two weeks after she was shot, Diaz died of the gunshot wounds she had sustained. Rodriguez survived the shooting.

## The Relevant Statutory Provisions

For Counts 3 and 7, the mandatory minimum term of imprisonment is 20 years, and the maximum term of imprisonment is life imprisonment or death, pursuant to 21 U.S.C. § 848(e)(1)(A). For Counts 4 and 8, the maximum penalty is life imprisonment, pursuant to 18 U.S.C. § 924(j). For Counts 5 and 6, the mandatory minimum penalty is life imprisonment, pursuant to 18 U.S.C. § 1958.

For each count, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than five years, pursuant to 18 U.S.C. § 3583(b)(1). Such terms

of supervised release run concurrently, pursuant to 18 U.S.C. §
3624(e).

For each count, the Defendant is not eligible for
probation because the instant offenses are Class A felonies,
pursuant to 18 U.S.C. § 3561(a)(1).

The maximum fine for each count is $250,000, pursuant
to 18 U.S.C. § 3571. A special assessment of $100 per count,
for a total of $600, is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2011 edition of the United States
Sentencing Commission Guidelines Manual has been used in this
case for calculation purposes, pursuant to § 1B1.11(a). The
Defendant's applicable offense level, criminal history,
recognition of responsibility, and term of imprisonment are as
follows:

Each of the offenses involve murder as the underlying
offense, which is covered by §2A1.1. It is also noted that
guidelines for Counts 4 and 8 (§2K2.1(c)(1)(B)) and Counts 5 and

6 (§2E1.4(a)(2)) refer back to the guideline for the underlying murder offenses. As such, guideline computations will be performed under §2A1.1. As offenses committed under §2A1.1 are specifically excluded from grouping, pursuant to §3D1.2, separate calculations would ordinarily be performed for each Count. However, although there are six counts, these counts relate only to three victims. Counts 3 and 4 relate to the murder of Overman; Counts 5 through 8 refer to the shooting of Rodriguez and the murder of Diaz. Therefore, Group 1 will consist of Counts 3 and 4, and Group 2 will consist of Counts 5 through 8. Because the offense level for each of Group 1 and Group 2 is the same, only one guideline computation is necessary.

The guideline for a violation of 21 U.S.C. § 848(e)(1)(A) is found in §2A1.1(a) which provides for a base offense level of 43. Pursuant to §3D1.4, the combined multiple count adjusted offense level is 45, representing a two-level increase from the greatest of the adjusted offense levels for each Group. It is noted that the highest Offense Level pursuant to the Sentencing Table is 43.

On January 29, 1994, the police responded to a report

of a male on a rooftop at 1670 Boston Road, Bronx, New York. Maldonado was observed on the rooftop with a bag in his hand, trying to stuff the bag into a rooftop ledge. When asked to take his hands out of his pockets, a vial of crack cocaine fell to the ground, and Maldonado was subsequently placed under arrest. On February 14, 1994, Maldonado received a conditional discharge. Pursuant to §4A1.1(c), §4A1.2(d)(2)(B) and §4A1.2(e)(2), this conviction warrants one criminal history point.

On October 26, 1994, Maldonado was arrested at East 174th Street and Boston Road, Bronx, New York, after he was found to be in possession of a loaded .25 caliber Raven automatic pistol. On May 5, 1997, Maldonado was sentenced to one year imprisonment. Pursuant to §4A1.1(b) and §4A1.2(e)(2), this conviction warrants two criminal history points.

On October 12, 1995, Maldonado was arrested for the murder of Rasheem Washington. According to the presentence report prepared for this offense, on October 1, 1995, at approximately 2:15 a.m., Maldonado shot Rasheem Washington several times in front of 1233 Boston Road, Bronx, New York, causing his death. He also attempted to cause the death of

Terrance Crawford, Tawan Crawford and Edlawn Edwards by shooting at them. On May 5, 1997, Maldonado was sentenced to 25 years' to life imprisonment for murder in the second degree and five to ten years' imprisonment for attempted murder in the second degree. New York State Department of Corrections records reflect that Maldonado's earliest possible release date is March 10, 2030. Pursuant to §4A1.1(a) and §4A1.2(e)(1), this conviction warrants three criminal history points.

On July 29, 1997, while incarcerated at the Downstate Correctional Facility, Maldonado was arrested for assault. On May 7, 1998, Maldonado was sentenced to six months' imprisonment. Pursuant to §4A1.1(b) and §4A1.2(e)(2), this conviction warrants two criminal history points.

On April 23, 2006, while incarcerated at the Elmira Correctional Facility, Maldonado was arrested for assault. On January 3, 2006, at 8:25 a.m., a Corrections Officer observed Maldonado enter the 1-5 Gallery and engage Inmate Trysone Brown in a physical altercation. Maldonado struck Brown in the area of his head and face, and Maldonado made slashing type motions toward inmate Brown during the altercation. The altercation continued and the officer observed Brown striking Maldonado in

the area of the head, neck and face and also saw Brown make slashing type motions toward Maldonado. The altercation continued into the 1-5 Gallery Utility Sink Room. Correction Officers ordered the inmates to stop and they both complied. The inmates were separated and strip searched with no significant findings. A search of the area of the altercation produced the top razor portion of a Bic razor wrapped in masking tape. The razor, which was approximately 1 ¼ by ¼ inches and wrapped in masking tape, was secured as evidence. A subsequent search of Maldonado's cell revealed a state razor with no blade which was also secured in a contraband locker. During a subsequent interview of Maldonado, Maldonado advised that he had been having problems with Brown and that he had initiated the confrontation with Brown and used his issued state razor which he fashioned into a weapon. Maldonado further stated that during the altercation, he lost control of his weapon, and Brown took control of it and used it against him. On July 7, 2006, Maldonado was sentenced to five years' imprisonment for this offense. Pursuant to §4A1.1(a) and §4A1.2(e)(1), this conviction warrants three criminal history points.

The criminal convictions above result in a total of 11 criminal history points. According to the sentencing table at

Chapter 5, Part A, four criminal history points establish a Criminal History Category of V.

Based on a total offense level of 43 and a Criminal History Category of V, the guideline range for imprisonment is life. It is noted that the Defendant is subject to an un-discharged term of imprisonment. Pursuant to §5G1.3(c), in any other case involving an un-discharged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior un-discharged term of imprisonment to achieve a reasonable punishment for the instant offense.

The guideline range for a term of supervised release is at least two years but not more than five years, pursuant to §5D1.2(a)(1). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to §5D1.1(a).

Maldonado is not eligible for probation because the instant offenses are Class A felonies, pursuant to §5B1.1(b)(1).

The fine range for the instant offense is $25,000 to $250,000 pursuant to §5E1.2(c)(3). Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7).

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. Upon consideration of all of the relevant factors, it is concluded that the imposition of a Guideline sentence is warranted. The Court also recognizes that, pursuant to 18 U.S.C. § 1958, Counts 5 and 6 carry a mandatory penalty of life imprisonment.

## The Sentence

For the instant offenses, Maldonado is sentenced to

25

life imprisonment and five years' supervised release on each count, with the sentences to run concurrently to each other along with any sentences Maldonado is currently serving.

Maldonado is directed to report to the nearest United States Probation Office within 72 hours of release to commence his term of supervised release. It is recommended that Maldonado be supervised by the district of his residence.

As mandatory conditions of his supervised release, Maldonado shall:

    (1)   not commit another federal, state, or local crime;

    (2)   not illegally possess a controlled substance;

    (3)   not possess a firearm or destructive device; and

    (4)   refrain from any unlawful use of a controlled substance.

Maldonado shall submit to one drug testing within fifteen (15) days of placement on supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special condition:

> (1)   The Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.   The search must be conducted at a reasonable time and in reasonable manner.   Failure to submit to a search may be grounds for revocation.   The Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

A special assessment of $600, payable to the United States, is mandatory and shall be due immediately.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able

to pay a fine, and so the fine in this case shall be waived.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for March 22, 2012.

It is so ordered.

New York, NY
February 14, 2012

_____

**ROBERT W. SWEET**
**U.S.D.J.**